## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RONNY EASTRIDGE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 11-cv-693 |
| | ) | |
| BP AMERICA PRODUCTION | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant BP America Production Company ("BP") hereby gives notice and removes this case to the United States District Court for the Southern District of Alabama, Southern Division.

BP respectfully represents the following in accordance with the requirement of 28 U.S.C. § 1446(a) for a "short and plain statement of the grounds for removal":

## NATURE OF THE ACTION

1.     BP is a named defendant in the matter styled *Ronny Eastridge, et al. v. BP America Production Company, et al.*, pending in the Circuit Court of Mobile County, Alabama, and bearing the case number CV-2011-1102.00 ("State Court Action").

2.     Plaintiffs commenced this action by filing a lawsuit in the Circuit Court of Mobile County, Alabama, on November 2, 2011.  BP was served with process on November 7, 2011.

3.     According to the Complaint, "this case arises from uniform Master Vessel Charter Agreements entered into between Plaintiffs and Defendant BP America Production Company."  Compl. ¶ 29 (attached as Exhibit A).  Plaintiffs claim they entered into Master Vessel Charter Agreements "as part of BP's VOO Program," *id*., which was established "[f]ollowing the *Deepwater Horizon* oil spill . . . as part of BP's response to the oil spill," *id*. ¶ 30.  Plaintiffs allege that "BP has breached the terms of the uniform Master Vessel Charter Agreements" by "refus[ing] and fail[ing] to pay Plaintiffs for services, equipment, materials, repairs and decontaminations, as required by each of the Plaintiffs' Master Vessel Charter Agreements entered into with BP."  *Id*. ¶ 292.  In addition to breach of contract, Plaintiffs also allege causes of action for fraudulent misrepresentation, fraudulent suppression, and conspiracy, all stemming from their alleged participation in the Vessels of Opportunity program.  *See id*. ¶¶ 293-306.

4.     This case is similar to 16 actions related to the Vessels of Opportunity ("VoO") program that were removed from state court and transferred by the Judicial Panel on Multidistrict Litigation to the Eastern District of Louisiana for inclusion in the coordinated or consolidated pretrial proceedings occurring in MDL

2

No. 2179.[1]   *See* Transfer Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, Doc. 555 (J.P.M.L. filed April 18, 2011) (attached as Exhibit C).   Indeed, plaintiffs in those actions claim, as do Plaintiffs here, that BP breached obligations owed to them under Master Vessel Charter Agreements governing use of their vessels in the VoO program.

5.      Additionally, on February 9, 2011, in MDL No. 2179, plaintiffs submitted an Amended Master Complaint that includes among the categories of plaintiffs "Boat captains, crew, charterers, workers, and/or volunteers involved in the Vessels of Opportunity program ('VoO program') ***who were not adequately compensated for their work or time in the VoO program and/or whose property was damaged as a result of their work in the VoO program***."   First Amended Master Answer to Complaint and Petition of Triton Asset Leasing GmbH, et al., for Exoneration From or Limitation of Liability (Rule 9(h)), First Amended Master Claim in Limitation [No. 10-2771] (Rule 9(h)), and First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses

---

[1] Fifteen of those transferred actions were pending in this Court – *Brabner v. BP America Production Co.*, 10-cv-692; *Brooks v. BP America Production Co., et al.*, 11-cv-33; *Cain v. BP America Production Co.*, 10-cv-685; *Cain v. BP America Production Co.*, 10-cv-687; *Johnson v. BP America Production Co.*, 10-cv-693; *Johnson v. BP America Production Co.*, 10-cv-686; *Ladd v. BP America Production Co.*, 10-cv-694; *McClain v. BP America Production Co.*, 10-cv-689; *Pakhamma v. BP America Production Co.*, 10-cv-690; *Pakhamma v. BP America Production Co.*, 10-cv-691; *Russell v. BP America Production Co., et al.*, 11-cv-32; *Secor v. BP America Production Co.*, 10-cv-684; *Shivers v. BP America Production Co., et al.*, 11-cv-34; *Sprinkle v. BP America Production Co.*, 10-cv-683; and *Sprinkle v. BP America Production Co.*, 10-cv-688.

in Accordance with PTO No. 11 [CMO No. 1] Section III (B1) ["B1 Bundle"], Complaint in Admiralty ¶ 209(g), MDL No. 2179 (E.D. La. filed Feb. 9, 2011) (Docket No. 1128) (emphasis added) (attached as Exhibit D); *see also id*. ¶¶ 505-14 (describing VoO contract claims). And on July 8, 2011, Judge Barbier entered a case management order specifically "to facilitate the efficient and effective management and prosecution of the coordinated Vessels of Opportunity Program contract actions." Case Management Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, Doc. 3207 (E.D. La. July 8, 2011) (attached as Exhibit E). Hence, VoO-related contract claims, such as Plaintiffs', are part of the MDL No. 2179 proceedings.

6.     The claims Plaintiffs assert in this matter (as well as claims asserted by plaintiffs in similar matters) arise under federal law by reason of the Outer Continental Shelf Lands Act ("OCSLA") and are subject to the exclusive jurisdiction of the federal courts under the provisions of 43 U.S.C. § 1331, *et seq*., for several reasons, including the nexus of this case to a federal enclave.

## BASIS FOR FEDERAL JURISDICTION

7.     This case is removable to this Court under the jurisdictional grant of OCSLA, 43 U.S.C. § 1331, *et seq*. OCSLA provides, in relevant part, that "district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental

Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b)(1).

8.     OCSLA defines "minerals" as including "oil, gas, sulphur, geopressured geothermal and associated resources."   43 U.S.C. § 1331(q). "Exploration" is the "process of searching for minerals, including . . . any drilling." 43 U.S.C. § 1331(k)(2).  And "development" means "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered."  43 U.S.C. § 1331(l).

9.     The State Court Action arises out of, and has a connection with, BP operations conducted on the Outer Continental Shelf within the meaning of 43 U.S.C. §§ 1331(a) and 1301(a).   These operations "involve[d] exploration, development, or the production of minerals, of the subsoil and seabed of the outer Continental Shelf."   43 U.S.C. § 1349(b)(1)(A).   Accordingly, this Court has subject matter jurisdiction under 43 U.S.C. § 1349(b)(1)(A).

10.     Because, as Plaintiffs allege, their Master Vessel Charter Agreements with BP stem from the VoO program established in the wake of the *Deepwater Horizon* incident, *see* Compl. ¶¶ 29-30, and because details about the program are

relevant to the basis of this Court's subject matter jurisdiction under OCSLA, BP

sets forth the background of the program in some detail here.[2]

### A.    BP's Responsibilities Under the Oil Pollution Act of 1990.

11.    Under the Oil Pollution Act of 1990 ("OPA"), where a "discharge" of

oil "is of such a size or character as to be a substantial threat to the public health or

welfare of the United states," the President (or his designee) "shall direct all

Federal, State, and private actions to remove the discharge or to mitigate or prevent

the threat of the discharge."  33 U.S.C. § 1321(c)(2)(A) (part of the OPA session

law (Pub. L. No. 101-380, 104 Stat. 484, 524 (Aug. 18, 1990)), but codified as part

of the Clean Water Act).  To prepare for a potential oil spill, OPA directs the

President to prepare and publish a National Contingency Plan ("NCP").  *See* 33

U.S.C. § 1321(d)(1), 40 C.F.R. Part 300.  In the course of responding to an oil

spill, "[e]ach Federal agency, State, owner or operator, or other person

participating in efforts under this subsection shall act in accordance with the

National Contingency Plan or as directed by the President."   33 U.S.C.

§ 1321(c)(3)(A).   The NCP establishes a "basic framework for the response

management structure" in the form of a "unified command system" to "bring

together the functions of the Federal Government, the state government, and the

---

[2] The Eleventh Circuit has made clear that this Court is authorized to rely on materials such as those cited herein to determine its own jurisdiction.  *See, e.g.*, *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 759 (11th Cir. 2010) (holding that defendants can "offer their own affidavits or other evidence to establish federal removal jurisdiction").

responsible party to achieve an effective and efficient response, where the [Federal On-Scene Coordinator] maintains authority."  40 C.F.R. § 300.105(d).

12.    Because they are "responsible parties" under OPA, OPA imposes obligations on lessees or permittees (such as BP) in connection with spill incidents on the Shelf.  *See* 33 U.S.C. §§ 2701(16) (defining "lessee"), 2701(25) (defining "Outer Continental Shelf facility"), 2701(28) (defining "permittee"), 2701(32)(C) (defining "responsible parties" to include "the lessee or permittee of the area on which the facility" on the Shelf is located).  OPA specifically references the OCSLA regime.  *See, e.g.*, *id.* § 2701(16).  Those "participating in" removal efforts "shall act in accordance with the National Contingency Plan and the applicable [Area] response plan . . . , or as directed by the President, except that . . . deviat[ion] from the applicable response plan [is possible] if the President or Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects."  33 U.S.C. § 1321(c)(3)(B).

**B.    Spill Response, the Unified Command, and the Vessels of Opportunity Program.**

13.    Pursuant to these (and other related) statutory authorities, the federal government established a "Unified Command" structure under the National Contingency Plan, 40 C.F.R. Part 300, in the wake of the *Deepwater Horizon* spill to manage spill response.  *See* Kissinger Decl. ¶ 5 (attached as Exhibit F).  The

Unified Command brought together the federal and state governments, as well as "responsible parties" (such as BP) under OPA, to take action to counter the oil spill consistent with the NCP.  *See id*. ¶ 5. The Federal On-Scene Coordinators from the United States Coast Guard retained ultimate decision-making authority at all times over the Unified Command, however.  *See id.*

14.    As part of its integrated response to the oil spill, the Unified Command set up the VoO program.  *Id*. ¶ 7.  Under the VoO program, BP, as a participant in the Unified Command structure, entered into Master Vessel Charter Agreements with vessel owners to facilitate the use of the vessels in connection with the Unified Command's response to the spill.  *Id*. ¶ 8.

15.    Vessels in the VoO program performed a variety of response, recovery and containment activities directly related to the oil spill — "including towing and deploying boom, skimming oil, locating and recovering tar balls, transporting supplies and personnel, and supporting *in situ* controlled burning operations" — ***all pursuant to operational directives, and hence under the direction, of the Unified Command***.  *Id*. ¶ 9.  Thus, a July 21, 2010 Unified Command press release announcing the opening of oil spill response offices implementing the VoO program (among others), provided that those offices will be "under the joint tactical direction of the U.S. Coast Guard and BP."  Exhibit G.[3]

---

[3] *See also* Exhibit H (Unified Command press release July 14, 2010) (announcing U.S. Coast

16.     VoO activities were managed as a unified whole across federal and state waters, performing any operations deemed necessary by the Coast Guard. *See* Kissinger Decl. ¶ 10.  Thus, Rear Admiral Landry (at the time, the Federal On-Scene Coordinator) said at a May 27, 2010 Unified Command briefing that "We not only have National Guard troops, but we have every agency involved at the federal level, state level, local communities, volunteers, you know the vessel of opportunity skimming system with the — that BP-hired shrimpers who are out of work to be able to work on this and so it's been an all-hands-on-deck effort and let's not forget the private sector, the commercial people that have been trained and our staff to respond to these spills."  Exhibit J.

17.     Similarly, at a June 21, 2010 press briefing, Admiral Allen (then-National Incident Commander) explained that the Unified Command "continue[d] to make progress with the vessels of opportunity, putting them into taskforces, assigning them to Coast Guard units or a larger ship that has communications capable of receiving, signing reports and making the referrals.  We're also looking to putting automated identification and GPS trackers on these things so we can see them without any communication being required."  Exhibit K.  As Admiral Allen stated in a June 7, 2010 press briefing, that integrated response included the

Guard plans to improve the VoO program in Florida); Exhibit I (Unified Command press release July 16, 2010) (announcing new Louisiana Unified Command guidelines "to enhance the [VoO] program").

employment of "smaller skimmers and smaller vessels that can work in the harbors and the bays *up to 50 miles offshore*."  Exhibit L (emphasis added).

18.    The schematic attached as Exhibit M shows conceptually how the Unified Command flowed directly out of the OCSLA and OPA statutes and the NCP, as well as where the VoO program fit as part of the vast range of response efforts conducted by the Unified Command at the direction of the Federal On-Scene Coordinator.  Compare the highlighted sections to the schematic overall to see the VoO program in larger context.  The yellow highlighting is intended to show how the VoO program might be viewed if looked at in isolation (with blinders on as to the rest of the schematic) — as simply a series of contracts between BP and VoO owners to perform targeted cleanup operations.   The problem with such a view is that the yellow-highlighted areas show only a very small portion of the full picture of the VoO program in terms of its statutory and regulatory origins or its nexus to the Shelf activities that led to the *Deepwater Horizon* oil spill.  Importantly, the red-enclosed areas and red arrow on the diagram are intended to point out that the VoO program and its contracts were not the result of a two-party relationship between BP and VoO owners alone.  Rather, the red areas on the schematic reflect the reality that the Federal On-Scene Coordinator (*i.e.*, the Coast Guard) established the VoO program with BP, oversaw its creation, and was the ultimate authority in directing VoO activities on a day-to-

day basis.  At no point were the private parties acting within the Unified Command not subject to federal authority and control.

### C.   Plaintiffs' Complaint.

19.    Plaintiffs' Complaint alleges causes of action for breach of the Master Vessel Charter Agreements, fraudulent misrepresentation, fraudulent suppression, and conspiracy.  Plaintiffs allege that they "participated in Defendant BP America Production Company's Vessels of Opportunity Program," Compl. ¶ 1, which was established "as part of BP's *response to the [Deepwater Horizon] oil spill*," *id*. ¶ 30 (emphasis added).  As stated, Plaintiffs claim, among other things, that they suffered damages as a result of BP breaching the Master Vessel Charter Agreements by "refus[ing] and fail[ing] to pay Plaintiffs for services, equipment, materials, repairs and decontaminations."  *Id*. ¶ 292.

20.    The Master Vessel Charter Agreements, an example of which is attached as Exhibit N, make clear that Plaintiffs' claims arise from and are inextricably connected to OCS operations, including the exploration, development, or production of oil in the OCS subsoil and seabed.  The Agreements themselves provide that:

- "[T]he VESSEL shall be employed exclusively for [BP's] use as a vessel of opportunity in the carriage of [BP's] employees, contractors, business invitees, equipment and provisions and in the performance of various tasks *associated with oil spill response and containment efforts as directed by* [*BP*] (hereinafter referred to as SERVICES).   Such SERVICES shall include, but not be limited to, tending or deploying

boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment." Agreement Art. 2.A (emphasis added).

- "Vessel Owner, its subcontractors, and their respective employees will be performing certain services with respect to the tending or deploying boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment operation *in connection with the Deepwater Horizon incident*." Agreement Ex. C (emphasis added).

21.     In sum, Plaintiffs' Complaint alleges claims arising out of exploration and drilling operations on the OCS and the oil spill in the Gulf of Mexico — specifically, claims stemming from BP's federally required and directed clean-up efforts through the contractual VoO program.  Had BP not been performing exploratory and drilling operations on the OCS, Plaintiffs would have had no occasion to file the Complaint at stake in this case, because the VoO program itself would never have been established by the Unified Command and carried out pursuant to contracts between VoO owners and BP.

**D.     Original Jurisdiction.**

22.     <u>OCSLA Jurisdiction</u>: Accordingly, this Court has jurisdiction over the underlying claims pursuant to 43 U.S.C. § 1349(b)(1)(A), which by its terms grants United States District Courts a broad span of jurisdiction to decide any action "arising out of, or in connection with" exploration and drilling operations on the Shelf.

12

23.    This Court has original jurisdiction for purposes of removal under 28 U.S.C. § 1441(a) because Plaintiffs' complaint alleges damages that would not have occurred but for the *Deepwater Horizon* incident, an operation on the OCS involving the exploration or production of minerals.

24.    <u>Federal Question Jurisdiction</u>: This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, in that the claims asserted arise under a federal statute, namely, OCSLA, 43 U.S.C. § 1331, and because claims involving federal enclaves like the Outer Continental Shelf by their nature arise under federal law.  Federal-question claims ordinarily are subject to the well-pleaded complaint rule, but cases involving federal enclaves unavoidably involve federal and not state law, regardless of whether a plaintiff invokes federal law on the face of the complaint.

25.    OCSLA not only provides that federal courts have original jurisdiction over all cases arising out of Shelf operations, it also directly specifies that federal law governs as a substantive matter.  *See* 28 U.S.C. § 1333(a)(1). Hence, federal question jurisdiction under 28 U.S.C. § 1331 inherently and unavoidably exists over claims that arise out of Shelf conduct without regard to claims made by plaintiffs that a source of law is other than federal law, such as state law controls.

26.     Plaintiffs' claims "arise under" federal law for purposes of removal under 28 U.S.C. § 1441(b) because OCSLA establishes a federal enclave on the OCS.  Claims arising out of conduct within federal enclaves necessarily arise under federal law.

27.     Accordingly, this case is removable under both 28 U.S.C. §§ 1441(a) and (b).

## REMOVAL UNDER 28 U.S.C. §§ 1441(a), (b) and (c), TIMELINESS AND VENUE

28.     Removal is proper under 28 U.S.C. §§ 1441(a) and (b), which permit removal if the Court has either independent jurisdiction or arising-under jurisdiction "without regard to the citizenship or residence of the parties." Removal of all claims in this case is proper under 28 U.S.C. § 1441(c).

29.     Venue is proper in this Court under 28 U.S.C. § 1446(a), as this Court is the United States District Court for the district and division within which the State Court Action is pending.  And removal is timely under 28 U.S.C. § 1446(b), as BP was served on November 7, 2011.

## EFFECTUATION OF REMOVAL AND APPLICABLE PROCEDURAL REQUIREMENTS

30.     BP hereby removes this matter to the United States District Court for the Southern District of Alabama, Southern Division.

31.     BP and all properly named and served defendants expressly consent to this removal.[4]

32.     The matter may be removed without regard to the citizenship or residence of the parties, in accordance with 28 U.S.C. § 1441(b).

33.     Pursuant to 28 U.S.C. § 1446(a), BP attaches a copy of all process, pleadings and orders served on BP in the State Court Action, as well as copies of all documents on file in the record of the State Court Action that are within the possession, custody and control of BP.  *See* Exhibit B.[5]

34.     Pursuant to 28 U.S.C. § 1446(d), BP is providing written notice of the filing of this Notice of Removal to all adverse parties.

35.     The allegations of this Notice were true at the time the State Court Action was commenced and remain true as of the date of filing of this Notice of Removal.

---

[4] Attached As Exhibit O to this Notice of Removal are consents to removal from Defendants Danos & Curole Staffing, LLC, Parsons Corporation, Jason Ziglar, Justin Nash, Charlotte Thompson, Ed Thompson, Joseph Lobo, Jeff Johnson, Darryl Gonzalez, Dennis Berg, Danny Black, Michael Allen, Michael English, Brandy Buxton, Phil Payne, Michael Epps, Leigh Barnes, Marsha Davidson, and Donald Frederickson, II.  On information and belief, Defendants Trudy Roe and Devon Doe have not been served properly with the complaint.  As the Eleventh Circuit recently reiterated, "[t]he requirement that there be unanimity of consent in removal cases with multiple defendants does not require consent of defendants who have not been properly served."  *Johnson v. Wellborn*, No. 10-12494, 2011 WL 914302, at *4 (11th Cir. March 17, 2011) (per curiam) (citing *Bailey v. Janssen Pharmaceutica, Inc.*, 536 F.3d 1202, 1208 (11th Cir. 2008)).

[5] Plaintiffs' Complaint is attached as Exhibit A.

36.     Undersigned counsel certifies that a notice of filing removal, along with a copy of this Notice of Removal, will be filed promptly with the Circuit Court of Mobile County, Alabama.

WHEREFORE, BP hereby removes this action to the United States District

Court for the Southern District of Alabama, Southern Division.


Dated:  December 7, 2011

Respectfully submitted,

LIGHTFOOT, FRANKLIN &
WHITE, L.L.C.


 /s/ *William H. Brooks*
John M. Johnson (JOHNJ7318)
Adam K. Peck (PECKA0851)
William H. Brooks (BROOW3330)
Marchello D. Gray (GRAYM6384)
LIGHTFOOT, FRANKLIN &
WHITE, L.L.C.
400 North 20th Street
Birmingham, Alabama 35203
Tel: (205) 581-0700
Fax: (205) 581-0758
JJohnson@lightfootlaw.com
APeck@lightfootlaw.com
Wbrooks@lightfootlaw.com
MGray@lightfootlaw.com

*Attorneys for BP America Production
Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of December, 2011, I electronically filed the foregoing via the CM/ECF system, which will send notification of such filing to:

George W. Finkbohner, Esq.
William E. Bonner, Esq.
**CUNNINGHAM BOUNDS, LLC**
1601 Dauphin Street
Mobile, Alabama 36604
Telephone:  (251) 471-6191
Facsimile:  (251) 479-1031


David A. Bagwell, Esq.
Post Office Box 2126
Fairhope, Alabama 36533
Telephone:  (251) 928-2970
Facsimile:  (251) 928-6597


Samuel N. Crosy
**STONE, GRANADE & CROSBY, P.C.**
7133 Stone Drive
Daphne, Alabama 36526
Telephone:  (251) 626-6696
Facsimile:  (251) 626-2617


E. Britton Monroe
Patrick Patronas
R. Burns Logan
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
2501 20th Place South, Suite 300
Birmingham, AL 35223


/s/ *William H. Brooks*
Of Counsel

18